IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| ISAAC MITTELSTAEDT,<br><br>    Plaintiff,<br><br>vs.<br><br>KIM CHESHIRE, jail commander at Cache County Jail, individually; KATHLEEN GITTINS, JARED KELLER, TERRI DUNCOMBE, employees at the Cache County jail, individually; and JOHN DOES 1-10, individually,<br><br>    Defendants. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 1:03-CV-00121 PGC |

Plaintiff Isaac Mittelstaedt was an inmate at the Cache County Jail when, on July 3, 2002, he tied a bed sheet around a pipe near the ceiling of his cell and tried to hang himself. He alleges that during the approximately two weeks prior to this suicide attempt, he and his mother repeatedly attempted to tell the defendants — all jail employees — that he was a suicide risk. The defendants failed, he alleges, to heed these warnings; by doing so, they allegedly violated Mittelstaedt's Eighth Amendment right to medical treatment. Mr. Mittelstaedt seeks relief for these alleged constitutional deprivations in this suit under 42 U.S.C. § 1983.

Defendants have moved for summary judgment on four different grounds.  First, they claim that Mr. Mittelstaedt cannot show they acted with "'deliberate indifference'" to his medical needs — the standard for proving an Eighth Amendment violation.[1]  Second, defendants claim that qualified immunity shields them from liability for any constitutional violation.  Third, they claim that Mittelstaedt cannot show any affirmative link between their acts and any constitutional deprivation.  Fourth, defendants claim that the Prison Litigation Reform Act bars Mr. Mittelstaedt's claims.

After carefully reviewing all the evidence and the parties' briefs, the court holds that summary judgment is appropriate for two separate reasons.  First, Mittelstaedt cannot show defendants were deliberately indifferent towards him.  Second, defendants are entitled to qualified immunity.  Because of these two conclusions, the court does not reach the merits of defendants' third and fourth arguments listed above.

**I.      Summary Judgment Standards and Undisputed Facts.**

Summary judgment is only appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"[2]  The court must "view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party."[3]  But "the 'mere existence of a scintilla of

---

[1] *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

[2] *Green v. New Mexico*, 420 F.3d 1189, 1192 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56©).

[3] *Id.* (citing *Plotke v. White*, 405 F.3d 1092, 1094 (10th Cir. 2005)).

evidence in support of the nonmovant's position is insufficient' to create a genuine issue of material fact."[4]  Thus, to preclude summary judgment, "the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant."[5]  In light of these standards, the court recites the facts.

Mr. Mittelstaedt was admitted to the Cache County Jail on June 19, 2002.  He had recently used large amounts of heroin and was thus placed in an observation cell because all intoxicated inmates are considered a suicide risk.  He had several abscesses and scabs on his face that he admitted resulted from heroin abuse.  He also had a scab on his left wrist that was the result of an apparent suicide attempt while previously incarcerated in Salt Lake County.

Mr. Mittelstaedt remained in the observation cell for several days so that defendants could monitor his behavior while the drugs left his system.  On June 23, he expressed a strong desire to be moved to a different, less restrictive cell.  But on that same day, Mittelstaedt's mother, Ms. Linda Cook, informed a non-defendant jail deputy that Mittelstaedt was experiencing suicidal thoughts.  The deputy passed this information to defendant Gittins, who immediately called a health care company with whom the jail had contracted.  Due to his mother's comments, Mittelstaedt remained in the observation cell so that jail employees could continue to monitor him.

The health care company sent licensed psychologist Dr. Russ Seigenberg to the jail the same afternoon defendant Gittins called.  Dr. Seigenberg thoroughly examined Mittelstaedt and

---

[4] *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068 (10th Cir. 2005) (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997)).

[5] *Id.*

posed specific questions about his prior suicide attempt in Salt Lake County.  After the examination, Dr. Seigenberg determined that Mittelstaedt was not a suicide risk.  Based on this conclusion, defendants decided to accommodate Mittelstaedt's request to get out of the observation cell by letting him into the general population during the day but keeping him in the observation cell at night.  But after some inmates then accused Mittelstaedt of stealing their property during the day, prison officials transferred him to a maximum security cell where he had access to a television and could converse with prisoners in adjacent cells but could not  mingle with the general population.

During the next week, Mittelstaedt made several written requests for medical attention.  The jail responded to each of them.  On one occasion, defendant Gittins took Mittelstaedt's vital signs in response to his complaints of anxiety.  His vital signs were within normal parameters.  He also made oral requests for medical attention, but he does not specify the dates of those requests nor the person to whom each was made.  He also received each day the medication his doctor had prescribed, and he received a new bandage that covered the scab on his wrist after he picked the scab and bloodied his old bandage.

While Mittelstaedt was incarcerated at the Cache County Jail, his mother called the jail many times to check on her son.  In her deposition, she testified that "[o]n all of my calls, it was just to check up on him.  There was no other reason that I called."[6]

The parties have placed particular emphasis on three calls she made during the twenty-four hours preceding Mittelstaedt's July 3, 2002, suicide attempt.  On the evening of July 2,

---

[6]Dep. Linda Cook 36:1–3.

2002, Ms. Cook called and spoke with someone she "believe[s] . . . was Kathleen Gitt[i]ns."[7] She testified in her deposition that she was "not positive"[8] she spoke with defendant Gittins but that Ms. Gittins's name "stay[ed] in [her] memory."[9]  Ms. Cook also called the jail twice on the morning of July 3, 2002.  When asked with whom she spoke on these two calls, Ms. Cook replied, "I didn't get a name, it was a man, that's on the first call.  The second call, I'm not sure who I talked to."[10]  Ms. Cook was then asked to discuss the substance of those two July 3 conversations.  She testified that "On July 3rd I asked them if they could get someone in there to talk to him . . . on this — one of these two calls at 8:00 in the morning.  If he could get — if they could send someone in to talk to him."[11]  She later admitted that she did not know if anyone visited Mr. Mittelstaedt that day as a result of her request.[12]

As her deposition progressed, Ms. Cook was again pressed for the specifics of her two July 3 conversations.  In particular, defense counsel focused on whether — after lodging the initial complaint that triggered Dr. Seigenberg's examination — she told anyone at the jail that her son was suicidal.  Quoting from her deposition:

> Q: [Do you recall] retelling [jail personnel] that [Mr. Mittelstaedt] had suicide risks?

---

[7] *Id.* 41:24.

[8] *Id.* 41:24–25.

[9] *Id.* 42:13.

[10] *Id.* 50:13–15.

[11] *Id.* 51:17–22.

[12] *Id.* 52:14–21.

| | |
|---|---|
| A: | Well, yeah. I'm — yeah, I'm sure I didn't — I don't recall saying — well, I recall that I was concerned. Suicide was the main reason that I was calling. |
| Q: | And I agree with that and I'm not doubting that at all. But what you communicated and questioned the officers about or whoever it was that you spoke to, was that while he was in maximum and because he couldn't interact with other — |
| A. | Every time I called, I didn't call just to say how is he today, did he eat all of his spinach, I didn't call for things like that. My concern every single time I called, was that he was suicidal. Those — that's my concern. |
| Q. | And I'm not doubting that, I'm not doubting that, but you don't remember specifically when he was in A section, which was the maximum security, you don't remember specifically raising that issue as to whether he was suicidal, because you had already raised it; isn't that true? |
| A. | Well, it's the same people that I talked to. |
| Q. | Okay. |
| A. | I mean they're the same people. I didn't feel the need to — |
| Q. | Restate it. |
| A. | — say I'm concerned again, you know, they knew why I was calling. They all knew. |
| Q. | Okay. All right. |
| A. | I made a pest of myself. Not intentionally, but I just wanted to know. I was worried about him. |
| Q. | Right. And that's understandable. So you wouldn't have restated that he was suicidal? |
| A. | I don't know that I did or did not. I don't know. |
| | . . . . |
| Q. | [Did you restate] that he was — That you were concerned that he was — might be suicidal or that he had cut himself back when he was in Salt Lake County jail? |
| A. | I don't know one way or another. I didn't feel the need that I had to explain that every time I called, because I talked to the same people.[13] |

On redirect examination, her attorney asked, "After that first night when you talked to [jail personnel], expressed your concerns about him being suicidal, did you ever at any time after that

---

[13]*Id.* 124:23–127:2.

express the same concerns that you thought he might be suicidal?"[14]  Ms. Cook responded, "Yes, I did."[15]  She did not, however, state when or to whom she made those statements.

During the afternoon of July 3, defendant Keller walked by Mr. Mittelstaedt's cell. Mittelstaedt asked him to send someone so he could talk about his mental health.  Keller responded by saying "shut up or we will put in you solitary confinement."[16]  A short time later at about 2:00 p.m., Keller was escorting another inmate by Mittelstaedt's cell when he saw Mittelstaedt hanging from a sheet.  He secured the other inmate and, in a matter of seconds, entered Mittelstaedt's cell and began cutting him down.  Other officers arrived very shortly thereafter, and they were able to revive Mittelstaedt's breathing in his cell.  Emergency medical professionals then transported Mittelstaedt to the hospital for further treatment.

**II.    Defendants Were Not "Deliberately Indifferent" to Mr. Mittelstaedt's Constitutional Right to Custodial Medical Care.**

Mr. Mittelstaedt alleges that the facts outlined above show that defendants violated his Eighth Amendment rights by

> not keeping the plaintiff in a cell where he could be monitored 24 hours a day, by placing him in a cell equipped with sheets, a desk and pipes running along the ceiling, by not producing the medication that was prescribed for him, by ignoring his written requests for mental health counseling and prescriptions, and by placing the plaintiff in a maximum security cell where he could not associate with the general jail population and thereby decrease his anxiety symptoms.[17]

---

[14] *Id.* 128:16–20.

[15] *Id.* 128: 21.

[16] Aff. Isaac Mittelstaedt, ¶ 13.

[17] Am. Compl. [Docket No. 27], ¶ 26.

In essence, Mittlestaedt's claim reinforces the old adage that no good deed goes unpunished. He claims that defendants denied him adequate medical or mental health care by accommodating his requests to move out of the observation cell; providing a professional examination to determine whether he was a suicide risk; and then relying on that evaluation when responding to his requests for medical attention.

To begin with, the court notes that Mr. Mittelstaedt incorrectly believes his rights in this suit stem from the Eighth Amendment. In *Olsen v. Layton Hills Mall*,[18] the Tenth Circuit distinguished pretrial detainees — such as Mittelstaedt on the date of his suicide attempt — from convicted prisoners, and held that "'[p]retrial detainees are protected under the Due Process Clause rather than the Eighth Amendment.'"[19] This distinction, however, is largely academic, for in pretrial detainee § 1983 cases, the Tenth Circuit "'applies an analysis identical to that applied in Eighth Amendment cases.'"[20] But for clarity's sake, the court will refer to the rights Mittelstaedt seeks to vindicate as "Due Process rights" rather than Eighth Amendment rights.

To succeed on his § 1983 claim for denial of medical attention, Mr. Mittelstaedt must "'allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'"[21] Since Mittelstaedt's claim arises from an unsuccessful suicide attempt, the

---

[18] 312 F.3d 1304 (10th Cir. 2002).

[19] *Id.* at 1315 (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)) (alteration in original).

[20] *Id.* (quoting *Lopez*, 172 F.3d at 759 n.2).

[21] *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

facts must specifically show that defendants were "'deliberately indifferent' to a *substantial risk of suicide*."[22]

The Tenth Circuit has held that "'[d]eliberate indifference' involves both an objective and a subjective component."[23] The objective component "is met if the deprivation is 'sufficiently serious' — that is, 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"[24] The subjective component, in turn, "is satisfied if an officer 'knows of and disregards an excessive risk to [a detainee's] health or safety.'"[25] A disputed material fact as to either component will preclude summary judgment.[26]

A.   Objective Component of Deliberate Indifference

Mr. Mittelstaedt concedes in his brief opposing summary judgment that "there is not evidence to support a specific diagnosis by a physician mandating treatment."[27] He contends, however, that the objective component is nonetheless satisfied because

> when all of the facts are taken together as a whole, it should have been obvious to a lay person, and even more so [to] a nurse trained in mental health issues as

---

[22] *Barrie v. Grand County*, 119 F.3d 862, 869 (10th Cir. 1997) (emphasis added).

[23] *Olsen*, 312 F.3d at 1315 (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

[24] *Id.* (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).

[25] *Id.* (quoting *Sealock*, 218 F.3d at 1209) (alteration in original).

[26] *Id.* at 1316.

[27] Pl.'s Mem. in Opp'n to Mot. for Summ. J. [Docket No. 46], at 11, *Mittelstaedt v. Cheshire*, Case No. 1:03-CV-00121 PGC (D. Utah Aug. 26, 2005).

defendant Gittins was, that the plaintiff was a definite suicide risk with serious mental health issues that needed to be addressed.[28]

The biggest problem with this argument is that Mr. Mittelstaedt had been affirmatively diagnosed as *not* a suicide risk.  On June 23, 2002, licensed psychologist Dr. Russ Seigenberg met with Mittelstaedt after Mittelstaedt's mother told a non-defendant jail deputy that her son was suicidal. Dr. Seigenberg thoroughly examined Mr. Mittelstaedt and made these findings:

> [M]et with this 23 year old Caucasian male.  He admits to a history of drug use and mood problems.  He stated that he never gets so depressed he is suicidal.  He stated that he is no longer withdrawing from heroin and feels much better physically.  He said that his main problem is that he is extremely bored in the observation cell. . . .
> 	He was cooperative and friendly, did not appear depressed.  He said he felt he would be able to do several months in jail if that [was his] sentence.  He also discusse[d] []his desire to stop using drugs and to get his life in order.
> 	He denied opening the cut on his left wrist to cause pain, said he just picked the scab.  There was no notic[e]able scar from a deep slice wound usually seen with serious suicide attempts.  He appears stable enough to get out of observation. . . .[29]

Dr. Seigenberg is a trained, licensed professional who — merely ten days before Mr. Mittelstaedt's suicide attempt — examined Mittelstaedt and concluded he was not a suicide risk. If Dr. Seigenberg could not discern a problem, the court fails to see how lay people could be expected to conclude otherwise.

Mr. Mittelstaedt argues that the court gives too much weight to Dr. Seigenberg's evaluation, and claims that certain post-evaluation evidence should have caused defendants to consider him a serious risk of suicide.  He claims that the requests for medical care he submitted

---

[28] *Olsen*, 312 F.3d at 1316.

[29] Aff. Captain Kim Cheshire, Ex. A.

to jail authorities on which he drew crying frowning faces,[30] and statements that he was "going crazy in his cell" and "had problems with breathing and anxiety,"[31] should have alerted the defendants to his suicidal ideations.  He also argues that defendants should not be able to avoid liability based on one doctor's diagnosis — that is, the fact that a doctor examined an inmate is not a "get-out-of-lawsuit-free" card for jail employees.

The court agrees with Mr. Mittelstaedt's position that a doctor's evaluation does not forever bar a lawsuit against jail employees.  But Mr. Mittelstaedt's argument gives too little weight to the evaluation.  Before jail employees can be subject to suit for acting in compliance with a doctor's advice, there must be some good reason for disregarding that advice.  Here, the undisputed facts show that Mr. Mittelstaedt was evaluated by a licensed professional the very same day that defendants learned he might be suicidal.  To be sure, some time then passed before Mr. Mittelstaedt's suicide attempt.  And the events that occurred during the ten days between this evaluation and his suicide attempt may have shown defendants that he was sad and anxious.  But that is not sufficient to preclude summary judgment — the facts must show that Mr. Mittelstaedt was "a *substantial risk of suicide*,"[32] and those facts must have been "so obvious that even a lay person would easily recognize"[33] his condition.  None of the events that occurred in the ten days between Mittelstaedt's classification as a non-risk and his suicide attempt could have caused

---

[30] Pl.'s Mem. in Opp'n to Mot. for Summ. J., Ex. 2.

[31] *Id.* at 12.

[32] *Barrie*, 119 F.3d at 869 (emphasis added).

[33] *Olsen*, 312 F.3d at 1315 (internal quotation marks omitted).

defendants to make the leap from "anxious" to "suicidal." Thus, Mr. Mittelstaedt fails to establish the objective component of deliberate indifference.

### B. Subjective Component of Deliberate Indifference

Dr. Seigenberg's findings are also the reason Mr. Mittelstaedt cannot establish the subjective component. As discussed, this component requires Mittelstaedt to show that defendants "'kn[ew] of and disregard[ed] an excessive risk'"[34] that he was suicidal. Dr. Seigenberg affirmatively concluded that Mittelstaedt was not a suicide risk. He found that Mittelstaedt was not depressed and that Mittelstaedt never got depressed enough to attempt suicide. Defendants could not have "know[n] of and disregard[ed]" a *nonexistent condition* — the doctor had affirmatively found there was no "substantial risk of suicide."[35]

As with the objective component, Mittelstaedt again claims that the facts that arose after his examination — that he was "going crazy in his cell" and "had problems with breathing and anxiety"[36] — should have led defendants to conclude he was a suicide risk These facts, however, do not help Mittelstaedt establish the subject component any more than the objective component. They do not create an inference that Mr. Mittelstaedt was suicidal; in fact, the court supposes many non-suicidal prisoners have experienced anxiety and restlessness and have expressed these feelings to jail personnel. Viewed in light of Mittelstaedt's admission to Dr. Seigenberg that he was "extremely bored" in his cell and Dr. Seigenberg's conclusion that Mittelstaedt was not a

---

[34] *Olsen*, 312 F.3d at 1316 (quoting *Sealock*, 218 F.3d at 1209).

[35] *Barrie*, 119 F.3d at 869.

[36] Pl.'s Mem. in Opp'n to Mot. for Summ. J., at 12.

suicide risk, these facts cannot preclude summary judgment because they would not permit "a reasonable jury [to] find in favor of the nonmovant."[37]

Mittelstaedt also alleges that defendants should have known he was suicidal because he made "several requests for medical attention due to suicidal ideation. Some of the requests were in writing, and some were oral."[38] The only evidence that any of the defendants received his oral requests is Mittelstaedt's affidavit testimony that he asked defendant Keller on July 3 — shortly before he attempted suicide — to have someone see him about his mental health. He also cites his mother's two calls to the jail on the morning of his suicide attempt as evidence that should have revealed Mittelstaedt was a suicide risk.

These facts do not establish the subjective element of deliberate indifference. The Tenth Circuit has held that deliberate indifference "'requir[es] a higher degree of fault than negligence or even gross negligence.'"[39] The undisputed evidence shows that defendants responded to each of Mr. Mittelstaedt's written requests for medical attention (albeit in ways that did not always conform to his desires);[40] defendants' responses were not negligent. And the Defendants' failures to respond to Ms. Cook's phone calls or Mittelstaedt's oral request were at most gross

---

[37]*Johnson*, 405 F.3d at 1068 (internal quotation marks omitted).

[38]Aff. Isaac Mittelstaedt, ¶ 4.

[39]*Barrie*, 119 F.3d at 869 (quoting *Berry v. City of Muskogee*, 900 F.2d 1489, 1495–96 (10th Cir. 1990)).

[40]Pl.'s Mem. in Opp'n to Mot. for Summ. J., Ex. 2.

negligence — in light of Dr. Seigenberg's evaluation, two calls and one request could not have created "a substantial risk of suicide"[41] that defendants "kn[ew] of and disregard[ed]."[42]

In sum, Mr. Mittelstaedt admits that his condition was not serious enough to be diagnosed by a licensed professional. The court fails to see how any lay person could have come to a conclusion that Mittelstaedt concedes would have eluded — and in fact did elude — professional diagnosis, even considering the post-evaluation facts Mittelstaedt highlights. Mittelstaedt thus cannot establish the objective component of deliberate indifference. And since the undisputed facts presented no substantial risk of suicide, there was nothing for the defendants to know of and disregard. The subjective component of deliberate indifference is thus likewise missing. As such, the court holds that defendants did not violate Mr. Mittelstaedt's Due Process rights and grants summary judgment in favor of defendants.

### III.     Defendants Are Entitled to Qualified Immunity.

Defendants have also claimed that they are entitled to qualified immunity. The court agrees and holds that qualified immunity is an alternative grounds for granting summary judgment in defendants' favor.

When a § 1983 defendant invokes qualified immunity as a defense on summary judgment, "the plaintiff must show the law was clearly established when the alleged violation occurred and must come forward with sufficient facts to show the official violated that clearly established law."[43] Thus, the court must first decide whether, "'[t]aken in the light most

---

[41] *Barrie*, 119 F.3d at 869 (internal quotation marks omitted).

[42] *Olsen*, 312 F.3d at 1315 (internal quotation marks omitted).

[43] *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002).

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'"[44] If the court answers that question in the affirmative, it must then "ask 'whether the right was clearly established.'"[45] "If the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity."[46]

Here, the court need progress no further than the initial inquiry. As discussed at length in Section II above, Mittelstaedt has failed to "come forward with sufficient facts to show" that the defendants violated his Due Process rights to medical care.[47] To briefly restate the pertinent facts, the evidence reveals that defendants accommodated virtually all of Mittelstaedt's medical needs. Upon Mittelstaedt's arrival, defendants placed him in an observation cell because he was intoxicated, and all intoxicated prisoners are considered a suicide risk.[48] They provided his medications every day.[49] They gave him a clean bandage after he picked a scab on his wrist and bloodied his existing bandage.[50] They ordered a psychiatric evaluation that was performed the very same day they first learned that he might be having suicidal thoughts. They responded to

---

[44] *Olsen*, 312 F.3d at 1312 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[45] *Id.* (quoting *Saucier*, 533 U.S. at 201).

[46] *Id.* (citing *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001)).

[47] *Farmer*, 288 F.3d at 1259.

[48] Pl.'s Mem. in Opp'n to Mot. for Summ. J., at 3–4.

[49] *See id.* Ex. 4.

[50] *See id.* Ex. 3.

each of his formal requests for medical attention.[51] And defendant Gittins took Mittelstaedt's vital signs and blood pressure when he complained of chest pain.[52]

In opposition to all this evidence that defendants met Mittelstaedt's medical needs, he provides only a few isolated examples of noncompliance with his requests. On July 1, 2002, when defendant Gittins took Mittelstaedt's vital signs, she denied his request for anti-anxiety medication — she did so, however, because she had already contacted a physician who said he was not going to give Mittelstaedt any drugs that could be addicting.[53] In addition, his mother called the jail three times within twenty-four hours of his suicide attempt. But as her deposition testimony shows, it is not clear that she actually restated in those calls her concerns that Mittelstaedt was suicidal. And about one hour before his suicide attempt, defendant Keller received but apparently never acted on Mittelstaedt's oral request that someone come see him about his mental health. These facts simply do not demonstrate that defendants' "conduct violated a constitutional right."[54] Defendants are therefore entitled to qualified immunity.

## IV. CONCLUSION

Defendants' motion for summary judgment [Docket No. 35] is GRANTED for two separate reasons. First, defendants did not show "deliberate indifference" to Mr. Mittelstaedt. They did not knowingly disregard a substantial risk that Mittelstaedt would commit suicide.

---

[51]*See id.* Ex. 2.

[52]*See id.* Ex. 3.

[53]*See id.* Ex. 3.

[54]*Olsen*, 312 F.3d at 1312.

Second, defendants are entitled to qualified immunity because the facts do not show they violated Mittelstaedt's Due Process rights. The clerk's office is directed to close the case.

    SO ORDERED.

    DATED this 24th day of October, 2005.

                      BY THE COURT:

                        _____
                      Paul G. Cassell
                      United States District Judge